**AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT**

I, Danielle Ray, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Washington Field Office ("WFO"), and have been so assigned since 2009. I have spent the entirety of my FBI career working on national security investigations. During this time, I have received training at the FBI Academy located at Quantico, Virginia, specific to both counterterrorism and counterintelligence investigations. From October 2012 until March 2018, I was assigned to a counterterrorism squad. I am currently assigned to investigate counterintelligence and espionage matters and have been so assigned since March 2018. Based on my training and experience, I am familiar with efforts used to unlawfully collect and disseminate sensitive government information, including classified national defense information.

2. Your affiant is currently investigating the activities of MARIAM TAHA THOMPSON ("THOMPSON"), who your affiant believes transmitted classified national defense information to a faction within a foreign country and to a citizen thereof with the intent or reason to believe that it was to be used to the injury of the United States, or to the advantage of a foreign nation, and attempted and conspired to do so, in violation of 18 U.S.C. § 794(a), (c). These acts were begun and committed out of the jurisdiction of any particular State or district but within the extraterritorial jurisdiction of the United States, and are therefore within the venue of the United States District Court for the District of Columbia pursuant to 18 U.S.C. § 3239. Your affiant submits this complaint in support of the arrest of THOMPSON.

3. The facts in this affidavit come from your affiant's personal observations, training and experience, and information obtained from other U.S. Government officers, agents, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for THOMPSON's arrest and does not set forth all of your affiant's knowledge about this matter.

## STATUTORY AUTHORITY AND DEFINITIONS

4. For the reasons set forth below, there is probable cause to believe that THOMPSON violated Title 18, United States Code, § 794(a), (c).

5. Under 18 U.S.C. § 794(a), "[w]hoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished . . . by imprisonment for any term of years or for life . . . ."

6. Under 18 U.S.C. § 794(c), "[i]f two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy."

7. Under Executive Order No. 13526, information in any form may be classified if it: (1) is owned by, produced by or for, or is under the control of the United States Government; (2) falls within one or more of the categories set forth in the Executive Order [Top Secret,

Secret, and Confidential]; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security.

8. Where such unauthorized disclosure could reasonably result in damage to the national security, the information may be classified as "Confidential" and must be properly safeguarded. Where such unauthorized disclosure could reasonably result in serious damage to the national security, the information may be classified as "Secret" and must be properly safeguarded. Where such unauthorized disclosure could reasonably result in exceptionally grave damage to the national security, the information may be classified as "Top Secret" and must be properly safeguarded.

9. Classified information of any designation may be shared only with persons determined by an appropriate United States Government official to be eligible for access, and who possess a "need to know." Among other requirements, in order for a person to obtain a security clearance allowing that person access to classified United States Government information, that person is required to, and must agree to, properly protect classified information by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from authorized storage facilities, and by not storing classified information in unauthorized locations. If a person is not eligible to receive classified information, classified information may not be disclosed to that person. In order for a foreign government to receive access to classified information, the originating United States agency must determine that such release is appropriate.

10. Pursuant to Executive Order No. 13526, classified information contained on automated information systems, including networks and telecommunications systems, that

collect, create, communicate, compute, disseminate, process, or store classified information must be maintained in a manner that: (1) prevents access by unauthorized persons; and (2) ensures the integrity of the information.

  11. 32 C.F.R. Parts 2001 and 2003 regulate the handling of classified information. Specifically, 32 C.F.R. § 2001.43, titled "Storage," regulates the physical protection of classified information. This section prescribes that Secret and Top Secret information "shall be stored in a GSA-approved security container, a vault built to Federal Standard (FHD STD) 832, or an open storage area constructed in accordance with § 2001.53." It also requires periodic inspection of the container and the use of an Intrusion Detection System, among other things.

  12. On or about February 27, 2020,[1] Special Agents with the FBI arrested THOMPSON pursuant to a sealed complaint and arrest warrant filed with this Court (20-mj-00036) charging THOMPSON with a single count of Unlawfully Retaining National Defense Information in violation of 18 U.S.C. § 793(e). THOMPSON's arrest followed an investigation that revealed THOMPSON is a contract linguist, and prior to arrest, was assigned to a Special Operations Task Force facility in Erbil, Iraq. THOMPSON has been located at the facility in Erbil since mid-December 2019. During THOMPSON's time at the facility in Erbil, THOMPSON held a TOP SECRET U.S. government security clearance and had access to TOP SECRET national defense information. To obtain this clearance, THOMPSON had to undergo a background investigation and sign certain non-disclosure and user agreements

---

[1] The government refers to the dates in this affidavit as being "on or about" in part because of the 8-hour time difference between Eastern Standard Time (EST) and the local time in Erbil, Iraq.

outlining the potential consequences of mishandling classified national defense information.

13.     Starting on or about December 30, 2019, a day after U.S. airstrikes against Iranian-backed forces in Iraq, and the same day protesters stormed the U.S. embassy in Iraq to protest those strikes, audit logs show a notable shift in THOMPSON's network activity on networked Department of Defense systems accredited to process and store information up to the SECRET level. A review of THOMPSON's activities on those government-owned systems showed that THOMPSON accessed information THOMPSON did not have a legitimate need to access. Specifically, from on or about December 30, 2019, to on or about February 10, 2020, THOMPSON accessed approximately 57 files concerning eight human intelligence sources. These files contained classified national defense information including true names, personal identification data, background information, and photographs of the human sources, as well as operations cables detailing information the human sources provided to the United States government.

14.     During a court-authorized search of THOMPSON's living quarters in Erbil on or about February 19, 2020, FBI special agents discovered a document concealed beneath THOMPSON's mattress in THOMPSON's living quarters containing handwritten content in Arabic ("the Note"). THOMPSON's living quarters are locked and THOMPSON had exclusive use of the living quarters. FBI Agents reviewed a translation of the Note and confirmed it contains the true names of certain human assets ("Human Assets A, B, and C"). Specifically, the Note states that the named human assets were collecting information. The Note further instructs that the human assets' phones should be monitored and a named individual ("Target 1") should be warned. Agents confirmed that the human assets identified in the Note were, in fact, collecting information on behalf of the United States government. Further, the named

individual to be warned (Target 1) is affiliated with a designated foreign terrorist organization[2] and was, in fact, a target of the United States. Agents also confirmed that the Note contained national defense information classified at the SECRET level, meaning its unauthorized disclosure reasonably could be expected to cause serious damage to the national security. THOMPSON's living quarters were not an authorized location for the storage of classified national defense information.

15. Further, network activity logs show that on two consecutive days in January 2020, THOMPSON accessed two separate intelligence reports regarding one of the human assets identified in true name in the Note (Human Asset A). Both reports had clear classification markings noting that the reports themselves and Human Asset A's identity information were classified at the SECRET level.

16. Following THOMPSON's arrest in Erbil, THOMPSON provided a series of statements to the FBI after she was advised of her *Miranda* rights, and she knowingly and voluntarily waived those rights. During those statements, as further described in paragraph 21, *infra*, THOMPSON admitted to passing the national defense information contained in the Note, which THOMPSON admitted contained information classified at the SECRET level, to an individual (hereinafter the "Co-conspirator"). THOMPSON explained that she had a romantic interest in the Co-conspirator, and that THOMPSON provided the information in the Note to the Co-conspirator at the Co-conspirator's request. Investigation has revealed that the Co-conspirator is a Lebanese national located outside the United States.

---

[2] This foreign terrorist organization was designated by the Secretary of State over a decade ago. It is a different foreign terrorist organization from Lebanese Hizballah, discussed in paragraphs 17, 18 and 20, infra.

17. When asked to describe the Co-conspirator's affiliations, THOMPSON stated that:

THOMPSON: You know for sure i-if—if—if he is Shi'a— . . . if he is Shi'a, he will be involved with Amal or Hizballah. You know, one of these two, because this is what we have in Lebanon. Am I right? I don't know with which one he is affiliated. I don't know. He never told me, "I am with this," or "I am with this." He never told me. That's why I - I cannot, you know, tell you he is from Hizballah . . . And I will be – you know – you will say, "she is lying," or he – she – "He is in Amal . . . Oh, she is lying."

Interviewer: if he is not with Hizballah then – then who is he with?

THOMPSON: Amal. Amal Organization. . . Amal Organization . . . Because his two . . .

Interviewer: And – and it's one of the two?

THOMPSON: Yeah, one of the two. They are the same.

Interviewer: I just, I need you to understand that in providing him that information . . . you knew . . . or it's the understanding –

THOMPSON: I didn't know. No, no, no, no. I didn't know -- because I don't know with whom he is affiliated. . . . You know, I mean, if he is – if he is related with somebody – discovered that he is related with – uh – with organization. I am telling you, he is with Hizballah or Amal but, uh, I- no, he never told me. I didn't know. I didn't know with – I – you know – I think he is - - Maybe Amal? Amal Organization? Because most of the people over there were Amal Organization and entered from the – the you know – from kind of the people in – in the area where they live.

18. THOMPSON also stated that her Co-conspirator had influence because his nephew worked for the Ministry of the Interior ("Ministry") in Lebanon. THOMPSON then made the following additional statements regarding the relationship between the Ministry, Hizballah, and the Co-conspirator:

THOMPSON: No, I don't know about Hizballah. I hate Hizballah. . . . I don't know nothing about Hizballah, that they are – they are ruling Lebanon, it. . .

THOMPSON further stated that:

7

THOMPSON: The Ministry of Interior, you know . . . [they are a] religious organization, you know? You – I will describe them like – terrorists. . . Like terrorist organization.

[…]

Interviewer: So is your friend Hizballah then, if his nephew is sitting in there?

THOMPSON: No, no, no.

Interviewer: You said everyone in there.

THOMPSON: No. Uh, they are affiliated with Hizballah. And Amal. Amal and Hizballah, they are the same. Both of them. You know, like, uh, Hizballah can be covered by Amal.

19. Your affiant is aware that Amal is a political party in Lebanon.

20. When asked to explain her understanding of Hizballah, THOMPSON stated that Hizballah was "bad," that they "kill people," and that Hizballah members are "terrorists." THOMPSON also stated that Hizballah is "like the octopus. They can reach anybody. They are the government now." Hizballah was first designated a foreign terrorist organization in October 1997 and remains a designated foreign terrorist organization to this day.

21. During THOMPSON's initial post-*Miranda* interview, THOMPSON explained that she had relayed the classified national defense information in the Note to the Co-conspirator by memorizing the classified information that she had viewed, writing it down, and then using the video feature of a secure direct messaging application on her cellular phone to transmit her notes of the classified information to the Co-conspirator.[3]

---

[3] During a subsequent interview, THOMPSON modified this statement and claimed that she was 70% sure she had not transmitted the Note. As discussed below, the government has developed additional information that THOMPSON has, in fact, been successfully transferring classified national defense information regarding human assets to the Co-conspirator.

8

22. Pursuant to pen register and trap and trace ("PRTT") orders issued by the Court pursuant to 18 U.S.C. §§ 3122 and 3123, the FBI was able to view regular contact between the secure direct messaging account associated with THOMPSON, and the secure direct messaging account associated with the Co-conspirator.

23. On or about February 26, 2020, pursuant to a law enforcement emergency request under 18 U.S.C. § 2702, a service provider provided data from one of the Co-conspirator's internet accounts that is linked to his secure direct messaging account. That data included an image of an apparent screenshot of a secure direct messaging video chat between THOMPSON and the Co-conspirator. In the screenshot, THOMPSON is displaying a handwritten Arabic note (the "Second Note")[4] to the Co-conspirator that describes the technique a human asset was using to gather information. Significantly, the Second Note, captured in the screenshot, identifies by name a human asset (Human Asset D) who was not named in the Note found under THOMPSON's bed. The Second Note contains the true names of Human Asset A and Human Asset D. Based on THOMPSON's post-*Miranda* interview statements and prior training, THOMPSON understood such information to be classified at the SECRET level, meaning its unauthorized disclosure reasonably could be expected to cause serious damage to the national security. The FBI has confirmed that Human Asset D was also providing information to the United States government. When THOMPSON was confronted with the image of the Second Note, she admitted that the image captured her relaying information to the Co-conspirator using the secure direct messaging video function on her cellular phone. During this portion of the interview, THOMPSON acknowledged she could be

---

[4] The contents of this handwritten Second Note differed from those of the Note.

viewed as the Co-conspirator's source.

24.     Data obtained from the Co-conspirator's internet account showed an image that read "Hizbollah" in large Arabic letters. The image was used as the "cover image" for a group the Co-conspirator had joined through the internet account. Review of a second of the Co-conspirator's internet accounts, received pursuant to a second February 26, 2020 law enforcement emergency request under 18 U.S.C. § 2702, revealed photographs of Hizballah Secretary-General Hassan Nasrallah stored in the Co-conspirator's account.

25.     The data the FBI obtained from the Co-conspirator's first internet account also contained a screenshot of an image of an electronic device (the "Image") displaying detailed information that Human Asset D had provided to the United States government regarding a member of a foreign terrorist organization[5] who was being targeted by the United States ("Target 2"). This information was similar to the information contained in the Note that was concealed beneath THOMPSON's mattress. Like that Note, the Image contained information provided by a U.S. human asset (here Human Asset D), which described classified national defense information at the SECRET level regarding Target 2. Unauthorized disclosure of the information in the Image reasonably could be expected to cause serious damage to the national security.

26.     When confronted with the Image of the classified national defense information that was provided by Human Asset D regarding Target 2, THOMPSON denied transmitting the Image to the Co-conspirator.

---

[5] The individual named purportedly belonged to the same designated foreign terrorist organization that is described in footnote 2.

10

## CONCLUSION

27. Your affiant submits that the facts set forth in this affidavit establish probable cause to believe THOMPSON violated 18 U.S.C. § 794(a), (c). Therefore, your affiant respectfully requests this Court issue an arrest warrant for THOMPSON.

Respectfully Submitted,

_____
Danielle Ray
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this Fourth day of March, 2020

_____
THE HONORABLE ROBIN M. MERIWEATHER
 UNITED STATES MAGISTRATE JUDGE