UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL No. 20-CR-0067 (JDB) |
| | ) | |
| v. | ) | VIOLATION: |
| | ) | |
| MARIAM TAHA THOMPSON, | ) | 18 U.S.C. § 794(A) Delivering National |
| | ) | Defense Information to Representatives of |
| Defendant. | ) | a Foreign Government. |
| | ) | |

**STATEMENT OF OFFENSE IN SUPPORT OF PLEA OF GUILTY**

1.  The defendant, MARIAM TAHA THOMPSON ("THOMPSON") had been a contract linguist since the summer of 2006. Prior to her arrest in February of 2020, THOMPSON was assigned to a Special Operations Task Force facility in Iraq. THOMPSON was stationed at the facility in Iraq from mid-December 2019 until her arrest. During THOMPSON's time at the facility in Iraq, THOMPSON held a TOP SECRET//Sensitive Compartmented Information ("TS//SCI") U.S. government security clearance and was permitted access to national defense information classified up to the TOP SECRET//SCI level. To obtain this clearance, THOMPSON had to undergo a background investigation and to sign certain non-disclosure and user agreements outlining the potential consequences of mishandling classified national defense information.

2.  As a result of her training and review of non-disclosure and user agreements, THOMPSON knew that classified information of any designation may be shared only with persons determined by an appropriate United States Government official to be eligible for access, and who possess a "need to know." THOMPSON also understood that she was required to properly protect classified information by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from

authorized storage facilities, and by not storing classified information in unauthorized locations.

3. Based on her training and experience, THOMPSON knew that the unauthorized disclosure of SECRET information reasonably could be expected to cause serious damage to the national security of the United States. THOMPSON likewise knew that a violation of the rules governing the handling of classified information could result in criminal prosecution.

4. While stationed in Iraq, THOMPSON had access to detailed files regarding human assets who were working clandestinely on behalf of the United States. This national defense information was maintained on electronic devices classified at the SECRET level. THOMPSON understood that all of the information regarding these assets was national defense information classified at the SECRET level.

5. THOMPSON was born in Lebanon, but became a naturalized United States citizen in 1993. THOMPSON maintained contact with her family members in Lebanon and would occasionally visit Lebanon to see her family members. In 2017, a family member introduced THOMPSON to a Lebanese national (hereinafter "the unindicted coconspirator"). This introduction was made through social media. THOMPSON believed that the unindicted coconspirator was a wealthy and well-connected Lebanese national. Although THOMPSON never met the unindicted coconspirator in person, the unindicted coconspirator expressed an interest in marrying THOMPSON and having her move to Lebanon. THOMPSON eventually decided that she would marry the unindicted coconspirator after retiring.

6. Between 2017 and February 2020, THOMPSON and the unindicted coconspirator communicated with each other using the video-chat feature on a secure text and voice messaging application (hereinafter "the application"). THOMPSON and the unindicted coconspirator would often speak several times a day using the application. Through these

conversations, THOMPSON learned that the unindicted coconspirator had a nephew who was a member of the Lebanese Ministry of the Interior. Thompson also learned that the unindicted coconspirator was a Shia Muslim and that he claimed to have contact with members of Lebanese Hizballah. During one conversation, the unindicted coconspirator told THOMPSON that he had received a ring from Hassan Nasrallah, the secretary-general of Lebanese Hizballah. The unindicted coconspirator knew that THOMPSON was a military linguist for the United States government, but THOMPSON believes he did not know where she was stationed, and she never told him where she was stationed. Prior to January of 2020, the unindicted coconspirator did not ask THOMPSON to provide classified information to him.

7. Starting on or about December 29, 2019, the United States launched U.S. airstrikes against Kata'ib Hizballah, an Iranian-backed force in Iraq that has been designated as a foreign terrorist organization since 2009. On or about January 3, 2020, one of these strikes killed Iranian Revolutionary Guard Corps ("IRGC") Quds Force commander Qasem Suleimani and Iraqi militia leader Abu Mahdi al-Muhandis, founder of Kata'ib Hizballah.

8. Following Suleimani's death, the unindicted coconspirator contacted THOMPSON. The unindicted coconspirator was very emotional and upset about the U.S. airstrikes, especially the death of Suleimani, and he started to ask THOMPSON to provide "them" with information about the human assets that had helped the United States to target Suleimani. Based on her conversations with the unindicted coconspirator, THOMPSON understood "them" to be Lebanese Hizballah, including an unnamed high-ranking military commander of Lebanese Hizballah. The unindicted coconspirator told her to either access the information or ask other linguists for the information if THOMPSON herself did not have the requisite access. THOMPSON voluntarily decided to provide classified national defense

information of interest to the unindicted coconspirator and Lebanese Hizballah, believing that if she did not, their relationship would come to an end, and the unindicted coconspirator would not marry her.

9. Beginning in early January 2020, THOMPSON began to access networked Department of Defense systems accredited to process and store national defense information regarding human assets classified up to the SECRET level. THOMPSON accessed information regarding human assets that THOMPSON knew she did not have a legitimate need to access or know.

10. Initially, THOMPSON would view the national defense information classified at the SECRET level regarding the human assets, about which she had no need to know, and would commit the information to her memory as well as take notes on post-it notes. THOMPSON would then return to her living quarters where she would transfer the national defense information to more detailed handwritten notes. THOMPSON would then transmit the notes containing the national defense information she knew to be classified at the SECRET level regarding the human assets to the unindicted coconspirator using the video-chat feature of the application. The unindicted coconspirator would capture the information by taking a screenshot of their video chat.

11. The unindicted coconspirator would regularly praise THOMPSON for passing to him and his contacts the classified national defense information regarding the human assets. The unindicted coconspirator told THOMPSON that his contacts were pleased with the information that she had provided, and that he would introduce THOMPSON to the unnamed Lebanese Hizballah military commander when she came to Lebanon.

12. After receiving several transmissions of the handwritten notes from THOMPSON, which contained national defense information classified at the SECRET level, the unindicted coconspirator requested more detailed information. THOMPSON then changed her methodology of gathering national defense information classified at the SECRET level to transfer to the unindicted coconspirator. THOMPSON began to create her own intelligence reports on human assets by accessing different classified files, stored in different system locations, regarding the human assets. THOMPSON did not have a need to know the majority of the national defense information she accessed from the different locations on the classified government systems. THOMPSON would cut and paste information and images from these different documents and locations into a single Word document, and then THOMPSON would use her cellular phone to take a picture of the detailed information regarding the human asset. THOMPSON would close the Word document containing her custom-made intelligence report, without saving the Word document, so that no record of it would remain on the classified government system. THOMPSON would then send this image of the intelligence report she had created to the unindicted coconspirator using the application. THOMPSON would also use her cellular phone to take pictures of incoming messages from the human assets, and would transmit those images to the unindicted coconspirator during their conversations on the application.

13. Using the techniques described above, THOMPSON transmitted to the unindicted coconspirator national defense information classified at the SECRET level including true names, personal identification data, background information, and photographs of the human sources, as well as operations cables detailing information the human sources provided to the United States government. THOMPSON understood that the information she transmitted

to the unindicted coconspirator regarding human assets was national defense information classified at the SECRET level.

14. In addition to gathering classified national defense information regarding human assets who were cooperating with the United States, THOMPSON used the same techniques described above to identify priority United States targets. Once again, THOMPSON did not have a need to know this information. THOMPSON sent this information to the unindicted coconspirator along with both explicit and implicit warnings to U.S. targets. THOMPSON understood that the information that she transmitted to the unindicted coconspirator regarding the U.S. targets was national defense information classified at the SECRET level.

15. Finally, THOMPSON used the same methods described above to gather and pass to the unindicted coconspirator national defense information classified at the SECRET level regarding the tactics, techniques, and procedures ("TTPs") that the human assets were using to gather information on behalf of the United States. THOMPSON understood that by passing the TTPs information to the unindicted coconspirator, Lebanese Hizballah, Kata'ib Hizballah, and others could use the information regarding the TTPs to identify human assets who were working with the United States.

16. THOMPSON had reason to believe that the national defense information classified at the SECRET level that she was providing to the unindicted coconspirator regarding human assets, U.S. targets, and TTPs was being passed on to Lebanese Hizballah. On October 8, 1997, the United States Secretary of State designated Hizballah as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA"). The designation included the following aliases: Party of God, Islamic Jihad, Islamic Jihad Organization, Revolutionary Justice Organization, Organization of the Oppressed on Earth, Islamic Jihad for the Liberation of Palestine, Organization of Right Against Wrong, Ansar

Allah, and Followers of the Prophet Muhammad. On May 16, 2017, the Secretary of State amended the designation of Hizballah to include the following aliases: Lebanese Hizballah, also known as Lebanese Hezbollah, also known as LH; Foreign Relations Department, also known as FRD; and External Security Organization, also known as ESO, also known as Foreign Action Unit, also known as Hizballah ESO, also known as Hizballah International, also known as Special Operations Branch, also known as External Services Organization, also known as External Security Organization of Hizballah. To date, Hizballah remains a designated FTO. Based on her training and work experience, at the time of her passage of classified national defense information to the unindicted coconspirator, THOMPSON understood that Lebanese Hizballah was a designated foreign terrorist organization.

17. During the course of the conduct described above, THOMPSON passed to the unindicted coconspirator, with the belief that the information would be provided to Lebanese Hizballah, information regarding at least eight clandestine human assets; at least 10 U.S. targets; and multiple TTPs. THOMPSON intended and had reason to believe that this classified national defense information would be used to the injury of the United States and to the advantage of Lebanese Hizballah.

18. An original classification authority ("OCA") from the United States Central Command ("CENTCOM") has confirmed that the information THOMPSON provided to the unindicted coconspirator regarding human assets, targets, and TTPs is national defense information properly classified at the SECRET level both presently and at the time of THOMPSON's passage of the national defense information to the unindicted coconspirator.

## DEFENDANT'S ACKNOWLEDGMENT

I have read this Statement of Offense, understand it, and agree that it is true and accurate. While it is not a complete recitation of all that I did or all that I know, it represents some of my conduct and some of my knowledge concerning my own involvement in illegal activity. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this factual proffer fully.

3-22-2021
Date

MARIAM TAHA THOMPSON

## ATTORNEY'S ACKNOWLEDGMENT

I have read each of the pages constituting this Statement of Offense, reviewed them with my client, and discussed it with my client.

3/23/21
Date

DAVID BENOWITZ, ESQ.