## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 20-cr-0067 (JDB)** |
| | : | |
| **MARIAM TAHA THOMPSON,** | : | **Sentencing: June 23, 2021** |
| | : | |
| **Defendant.** | : | |
| | : | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing. In 2006, an interviewer conducting Mariam Taha Thompson's first U.S. security clearance background investigation asked her, "What do you think should happen to persons who are found guilty of committing espionage or treason against the United States?" Thompson responded, "They should go to prison for life, alone with no contact with anyone, ever." Nonetheless, in January and February 2020, Thompson engaged in acts of espionage against the United States by passing classified information to a Lebanese national who she knew had ties to a foreign terrorist organization. Thompson's actions placed the lives of United States service members and their allies in acute peril. As a result, the defendant now faces a maximum statutory sentence, and guideline advisory sentence, of life imprisonment. While the government is not requesting a life sentence, a sentence of 30 years is warranted in this case.

### I.      INTRODUCTION

On January 3, 2020, the United States conducted a military strike in Iraq that killed Iranian Revolutionary Guard Corps ("IRGC") Quds Force commander Qasem Suleimani and Iraqi militia leader Abu Mahdi al-Muhandis, the founder of Kata'ib Hizballah. The United States Secretary of

State had previously designated both the IRGC and Kata'ib Hizballah as foreign terrorist organizations.[1]  Both the IRGC and Kata'ib Hizballah are affiliated with each other, and closely allied with another designated foreign terrorist organization, Lebanese Hizballah.[2]  After the strike on Suleimani and al-Muhandis, United States military forces in Iraq faced the imminent threat of retaliatory attacks.  Against this backdrop, the defendant, then a contract linguist with the United States military, engaged in acts of espionage.

In February 2020, the Department of Defense ("DoD") and the Federal Bureau of Investigation ("FBI") determined that the defendant, a contract linguist based at a Special Operations Task Force facility in Erbil, Iraq, was making unauthorized disclosures of National Defense Information ("NDI") classified at the SECRET level to a Lebanese national who had ties to Lebanese Hizballah.  This classified NDI[3] included the identities of valuable human assets who were actively providing information to the United States, information regarding United States targeting efforts and United States military intelligence gathering techniques.  This highly sensitive classified NDI was used for offensive and defensive force protection measures in Iraq and elsewhere.

At the time of her unauthorized disclosures, the defendant had been a contract linguist for the United States military for more than a decade, and had been entrusted with a TOP

---

[1]     *See* https://www.state.gov/foreign-terrorist-organizations/.

[2]     *See generally,* Michael Knights, *Back into the Shadows? The Future of Kata'ib Hezbollah and Iran's Other Proxies in Iraq*, COMBATING TERRORISM CENTER AT WESTPOINT-SENTINEL, Oct. 2020, available at https://ctc.usma.edu/back-into-the-shadows-the-future-of-kataib-hezbollah-and-irans-other-proxies-in-iraq/

[3]     Unless otherwise indicated, as used in this memorandum the term "classified NDI" refers to National Defense Information classified at the SECRET level.

SECRET//SPECIAL COMPARTMENTED INFORMATION ("TS//SCI") security clearance, which gave her direct access to the classified information that she illegally passed to the Lebanese national.

On February 27, 2020, the FBI arrested the defendant in Erbil, Iraq, based on a sealed complaint charging the defendant with Unlawfully Retaining National Defense Information in violation of 18 U.S.C. § 793(e).   On March 3, 2020, the government filed a second complaint charging the defendant with Delivering National Defense Information to Representatives of a Foreign Government in violation of 18 U.S.C. § 794(a) and Conspiracy to Deliver National Defense Information to Representatives of a Foreign Government in violation of 18 U.S.C. § 794(c).  The FBI transported the defendant to the District of Columbia.  On March 5, 2020, a grand jury sitting in the District of Columbia returned a three count indictment charging the defendant with Conspiracy to Deliver National Defense Information to Aid a Foreign Government in violation of 18 U.S.C. § 794(c); Delivering National Defense Information to Aid a Foreign Government  in violation of 18 U.S.C. § 794(a); and Willful Retention of National Defense Information in violation of 18 U.S.C. § 793(e).

 On March 26, 2021, the defendant pleaded guilty to one count of Delivering National Defense Information to Aid a Foreign Government, in violation of 18 U.S.C. § 794(a).  At the time she entered her guilty plea, the defendant acknowledged that she believed that the classified NDI she was providing to the Lebanese national was being passed to Lebanese Hizballah, and that she

had access to this classified NDI because of the position of trust afforded her as a U.S. government security clearance holder.[4]

A violation of 18 U.S.C. § 794(a) carries a maximum statutory sentence of up to life imprisonment.

## II.   THE APPLICABLE GUIDELINES SENTENCE IS LIFE IMPRISONMENT

### A.   Applicable Law and Guidelines Calculation

"As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence. *Gall v. United States*, 522 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity that courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" *id.* at 109 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a

---

[4]     The plea agreement provided a substantial benefit to the defendant.  In addition to the government's agreement to dismiss the remaining charges of the indictment, the defendant also avoided additional potential charges including Providing Material Support or Resources  to a Designated Foreign Terrorist Organization in violation of 18 U.S.C. § 2339B, which carries a maximum sentence of up to 20 years imprisonment; and multiple counts of violating  50 U.S.C. § 3121(a) which protects the identities of United States agents, informants, and sources, carries a maximum sentence of up to 15 years imprisonment for each covert agent identified from classified materials, and requires that sentences pursuant to § 3121 be imposed consecutively to any other sentence.

sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough,* 552 U.S. at 576 (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).  In the context of terrorism cases, "the Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes.  '[T]errorism represents a particularly grave threat because the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal.'"  *United States v. Mumuni Saleh*, 946 F.3d 97, 112-13 (2d Cir. 2019) (quoting *United States v. Meskini*. 319 F.3d 88, 92 (2d Cir. 2003)).

In this case, the defendant pleaded guilty to delivering NDI classified at the SECRET level. Therefore, the defendant's base offense level is 37 pursuant to U.S.S.G. § 2M3.1.

## B.    Application of the Terrorism Enhancement

In her signed guilty plea and the accompanying statement of facts, the defendant admitted that her relevant conduct for sentencing included transmitting classified NDI to a foreign national with reason to believe that the information would be passed to a designated foreign terrorist organization.  Accordingly, the defendant agreed that pursuant to the terrorism enhancement contained in U.S.S.G. § 3A1.4, the defendant's base offense level would be increased by 12 levels, and her Criminal History Category would be set to VI.

The terrorism enhancement contained in U.S.S.G. § 3A1.4(a) applies to any "felony that involved, *or was intended to promote*, a federal crime of terrorism."  A federal crime of terrorism is defined in 18 U.S.C. § 2332b(g)(5) as an offense that 1) is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and 2) involves an offense enumerated in 18 U.S.C. § 2332b(g)(5)(B).

When analyzing the first prerequisite of a federal crime of terrorism, the defendant's personal motivation is not relevant.  "Section 2332b(g)(5)(A) does not require proof of a

defendant's particular motive" to influence or retaliate against a government, but "is better understood as imposing a requirement 'that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (quoting *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009)).  *See also United States v. Jayyousi,* 657 F.3d 1085, 1114–15 (11th Cir. 2011) (holding that terrorism enhancement under § 3A1.4 applies when purpose of defendant's activity is calculated to promote a terrorism crime regardless of defendant's personal motivations).  Thus, as the Second Circuit observed in *Awan*, evidence that a defendant*:*

> engaged in criminal conduct with knowledge that confederates solicited his actions to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, . . . could demonstrate that Awan's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object. A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics.

*Awan*, 607 F.3d at 317-318.

As explained in greater detail below, at the time the defendant disclosed classified NDI that she believed would be passed to Lebanese Hizballah, the defendant knew that Lebanese Hizballah was a designated foreign terrorist organization; that Lebanese Hizballah holds views inimical to the United States and its regional allies; that Lebanese Hizballah and its ally Kata'ib Hizballah were actively opposing the presence of the United States military in Iraq; that Lebanese Hizballah, Kata'ib Hizballah and Iran had publicly vowed to retaliate against the United States for military strikes against Kata'ib Hizballah and the strike that killed Qasem Suleimani and Abu

Mahdi al-Muhandis;[5] that Lebanese Hizballah had specifically requested the classified NDI that she provided to the Lebanese national; and that Lebanese Hizballah would use the classified NDI she provided to them to the injury of the United States and to the advantage of Lebanese Hizballah.

Thus, even if the defendant was motivated by a personal relationship, rather than ideological support, to provide classified NDI to Lebanese Hizballah, the underlying felony was nonetheless clearly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  Specifically, the defendant's acts of espionage were calculated to provide Lebanese Hizballah, Kata'ib Hizballah and Iran with information that they could use to directly retaliate against agents of the United States who were providing crucial human intelligence to the United States military.  Further, the defendant's acts of espionage that sought to shield individuals whom the United States was targeting was calculated to enable Lebanese Hizballah, Kata'ib Hizballah and Iran to  protect individuals who were actively engaged in missile attacks and other offensive actions against United States personnel and facilities in Iraq, and thereby enhance their continued attempts to intimidate and coerce the United States through such attacks.

While § 794 espionage offenses are not specifically enumerated in § 2332b(g)(5)(B), the enhancement is properly applied here under the "intended to promote" prong of the enhancement's language.  The intent to promote prong makes clear that if the underlying offense of conviction is not enumerated in § 2332b(g)(5)(B), the terrorism enhancement of  § 3A1.4 still applies "if the purpose or intent of the defendant's substantive offense of conviction or relevant conduct was to

---

[5]    See *infra* Section III(A)(2)(a) discussing direct threats from leaders of Kata'ib Hizballah, Lebanese Hizballah, and Iran who all issued public threats against the United States and its interests in the region shortly before the defendant began to engage in acts of espionage.

promote a federal crime of terrorism." *United States v. Arnaout*, 431 F.3d 994, 1000–01 (7th Cir. 2005); *see also Awan*, 607 F.3d at 314 ("Under the 'intended to promote' prong, however, so long as the defendant's offense was intended to encourage, further, or bring about a federal crime of terrorism as statutorily defined, the defendant himself does not have to commit an offense listed in § 2332b(g)(5)(B)"); *United States v. Hale,* 448 F.3d 971, 988 (5th Cir. 2005) (although defendant did not commit a federal crime of terrorism, the district court found that his actions were designed to promote a federal crime of terrorism—the murder of a federal officer or employee); *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004) ("Under a plain reading, the phrase 'intended to promote' means that if a goal or purpose was to bring or help bring into being a crime listed in 18 U .S.C. § 2332b(g)(5)(B), the terrorism enhancement applies."); *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001) (The phrase intended to promote "implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism.").

In this case, the defendant's delivery of classified NDI  in violation of § 794(a) had as one of its purposes, or furthered, or promoted, a violation of 18 U.S.C. § 2339B, an enumerated offense which prohibits one from providing material support to a designated foreign terrorist organization. Material support includes "any property, tangible or intangible, or service, . . . expert advice or assistance,[6] . . . [or] personnel (1 or more individuals who may be or include oneself)."  18 U.S.C. § 2339A.   Here, the defendant used her status as a government security clearance holder, her familiarity with electronic systems containing NDI classified at the SECRET level, and tradecraft

---

[6]      "The term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge."  18 U.S.C. § 2339A(b)(3).

that she had learned as a linguist with the United States military, to locate classified NDI, remove classified NDI from classified systems, create analytical products based on the classified NDI for the benefit of her Lebanese contact and transfer the classified NDI to her Lebanese contact.  Thus, the defendant used her specialized knowledge to provide expert advice and assistance to respond to the requests of her Lebanese contact.  Further, the defendant took these steps at the direction of her Lebanese contact, who she understood was seeking the information on behalf of Lebanese Hizballah.

Because the defendant committed a felony that promoted a federal crime of terrorism, the terrorism enhancement set forth in U.S.S.G. § 3A1.4 applies to this sentencing, increasing the defendant's base offense level by 12, and her Criminal History Category to VI.

### C.      Application of the Abuse of a Position of Trust Enhancement

In her guilty plea, the defendant also acknowledged that she had access to the classified NDI that she illegally disseminated because of the position of trust afforded her as a United States government security clearance holder.  As a result, pursuant to U.S.S.G. § 3B1.3, the defendant's base offense level is further increased by 2 levels.  Courts have applied the abuse of position of trust enhancement to individuals who worked for the United States government and who violated the Espionage Act.  *See*, *e.g.*, *United States v. Ford*, 288 F. App'x. 54, 61 (4th Cir. 2008) (No error in application of abuse of position of trust enhancement for 18 U.S.C. § 793 conviction because defendant's "abuse of his position of public trust contributed significantly to his commission of the offense.  [The defendant] simply would not have been able to commit the offense of retaining classified documents without permission if he had not held a top secret security clearance. . . ."); *United States v. Mallory*, 1:17-CR-154, Dkt. 280 at 16 (E.D. Va. 2019) (Ellis, J.) ("Indeed, he only had access to the information.  He only retained the information because of the position of trust

that he held at the time that he was employed by the agency."); *United States v. Pitts*, 973 F. Supp. 576, 584 (E.D. Va. 1997) (increasing abuse of position enhancement by one additional level for former FBI agent convicted of violating 18 U.S.C. § 794 who "held a special position of awesome responsibility and trust [and] was supposed to safeguard this nation from foreign espionage activity" but who "[i]nstead . . . betrayed his country by engaging in the very activity that he was sworn to protect the nation against"), *aff'd*, 176 F.3d 239, 245 (4th Cir. 1999) (affirming district court's enhancement where "abuse of trust was extraordinary").  As discussed below, the defendant used her access to highly sensitive NDI as a security clearance holder to commit her offense of conviction.

### D.    Additional Guidelines Adjustments

The defendant's guilty plea negated the need for extensive pretrial preparation, potentially protracted litigation under the Classified Information Procedures Act ("CIPA"), as well as trial itself.  Accordingly, pursuant to U.S.S.G. §§ 3E1.1 and 3E1.1(b), the government has agreed to a three-level reduction in the defendant's offense level.

The Presentence Investigation Report does not identify any additional adjustments or a basis for departure.  Accordingly, the estimated offense level is 48, however, the maximum allowable offense level pursuant to the Guidelines is 43.  Based on the defendant's estimated offense level and criminal history score, the defendant's estimated sentencing Guidelines range is life imprisonment.

Analysis of the Guidelines along with the sentencing factors enumerated in 18 U.S.C. § 3553(a) support the guidelines sentence of life imprisonment and, thus, also support the government's requested sentence of 30 years of imprisonment.

### III.    APPLICATION OF SENTENCING FACTORS

**A.    18 U.S.C. § 3553 (a)(1) – Characteristics of the Defendant and Nature and Circumstances of the Offense**

1.    *Characteristics of the Defendant*

The defendant was born in Lebanon in 1958.  The defendant attended school in Lebanon and received an associate's degree from the Arabic University in Beirut.  In the early 1980s, the defendant and members of her family fled to Saudi Arabia during the Lebanese civil war.  In Saudi Arabia, the defendant was employed as a servant to the Saudi royal family.  While living in Saudi Arabia, the defendant met her future husband, Arthur Thompson, who was a United States citizen. The Thompsons were married in Saudi Arabia in 1986.  The defendant first entered the United States in 1988, and became a fully naturalized United States citizen in 1993.  The defendant settled in Rochester, Minnesota, where she had four children with her husband before he passed away in 2002.  The defendant was briefly remarried, but her second marriage was tumultuous, and ended in a divorce in 2004.

The defendant struggled financially, and in 2006, the defendant sought and obtained a position as a contract linguist for the United States military.  In conjunction with this position, the defendant applied for and received an interim United States government security clearance at the SECRET level.  The defendant was granted a full SECRET clearance in 2009.  In 2010, the defendant received her interim TS security clearance, and her full TS clearance in 2012.  In 2016, the defendant was granted a TS//SCI security clearance.  The defendant remained a TS//SCI security clearance holder until her arrest in February 2020.

As a security clearance holder, the defendant received regular briefings regarding the rules for the handling and dissemination of classified material.  The defendant also signed non-

disclosure agreements that further emphasized the rules surrounding classified NDI.[7]   As the defendant acknowledged in her plea agreement, she knew that classified information of any designation may be shared only with persons determined by an appropriate government official to be eligible for access, and who possess a "need to know."  The defendant also understood that she was required to properly protect classified information by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from authorized storage facilities, and by not storing classified information in unauthorized locations. Critically, based on her training and her extensive experience in the field, the defendant also understood that the unauthorized disclosure of NDI classified at the SECRET level reasonably could be expected to cause serious damage to the national security of the United States.

During her time as a contract linguist, the defendant served extended tours of duty in the Middle East, including Baghdad, Iraq; Kabul, Afghanistan; Kandahar, Afghanistan; Kuwait; and Erbil, Iraq.  The defendant worked closely with members of the United States military, and as a result, learned about their training, tactics, and human intelligence gathering techniques.  Because of her extensive time in the field, the defendant was clear-eyed regarding the risks facing United States military personnel and the human assets who worked with the United States within active combat zones.

As discussed below, when the defendant decided to transfer NDI classified at the SECRET level, it does not appear that she was seeking any direct financial gain.  Rather, she was swayed by her romantic interest in a Lebanese national who she believed was going to marry her and

---

[7]     *See, e.g.* Unclassified Exhibits 1 and 2 containing signed Classified Information Security Briefing and Non-Disclosure Agreement.

support her after she retired.   However, the defendant's lack of a direct financial motive and lengthy history of support of the U.S. military's mission do not significantly mitigate the defendant's conduct.   Indeed, the defendant's in-depth knowledge of the value of human assets and how they were developed would have put the defendant on notice that her romantic interest had become a vulnerability, and that vulnerability was being exploited by Lebanese Hizballah.

        2.     *Nature and  Circumstances of the Offense*

To assess the seriousness of the defendant's conduct it is important to understand the context in which she engaged in acts of espionage, the effects of her actions, and the actions she took, and did not take, to mitigate the harm she caused.

        a.   <u>Erbil, Iraq 2019-2020</u>

The defendant served as a contract linguist at a Special Operations Task Force facility in Erbil, Iraq, from December 2019 until her arrest in February 2020.   The defendant had previously served as a contract linguist in Erbil between 2016 and 2018.   Erbil is in northeastern Iraq, and serves as the capital of the semiautonomous Kurdish region of Iraq.   Erbil's location near the Syrian, Turkish, and Iranian borders makes it militarily significant as evidenced by the United States' use of Erbil as a focal point in its fight against ISIS.[8]

By the end of 2019, while the defendant was based in Erbil, tensions were increasing between the United States, Iran, and Kata'ib Hizballah, with Iranian-backed militias like Kata'ib Hizballah moving rockets within range of and launching attacks against United States facilities in

---

[8]    *See generally,* President's Statement of August 9, 2014, describing U.S. Military action in and around Erbil.   Available at https://obamawhitehouse.archives.gov/the-press-office/2014/08/09/statement-president-iraq

Iraq.[9]  The threat of attacks against United States interests compelled the Department of State to remove all non-essential personnel from the embassy in Baghdad and the consulate in Erbil in the spring of 2019.[10]  This escalation in tensions led to a series of strikes between the United States, Iran, and Kata'ib Hizballah, and ultimately, the defendant's acts of betrayal.

On December 27, 2019, a rocket attack against a military base in Kirkuk, Iraq, resulted in the death of a United States civilian contractor, and the wounding of several United States military personnel.[11]  The United States assessed that Iran and Kata'ib Hizballah were responsible for the attack.[12]

On December 29, 2019, the United States responded by launching airstrikes against five different Kata'ib Hizballah sites in Iraq and Syria which targeted Kata'ib Hizballah weapons storage facilities and command and control centers.[13]  The airstrikes killed more than 20 Kata'ib Hizballah fighters.  This prompted al-Muhandis to directly threaten United States military personnel in Iraq, stating "the blood of the martyrs will not be in vain . . .  [o]ur response will be

---

[9]      *See* AS U.S.-IRAN TENSION SIMMERS, ROCKET FIRED NEAR IRAQ'S U.S. EMBASSY, Reuters May 19, 2019.  Available at https://www.reuters.com/article/us-u-s-iran-tension-simmers-rocket-fired-near-iraqs-u-s-embassy-idUSKCN1SP0NL

[10]      https://www.thedefensepost.com/2019/05/15/us-orders-partial-iraq-embassy-evacuation/

[11]      https://www.militarytimes.com/flashpoints/2019/12/28/several-american-troops-wounded-and-a-us-contractor-killed-in-rocket-attack-on-kirkuk-base/.

[12]      https://www.washingtonpost.com/national-security/us-launches-strikes-in-iraq-and-syria-targeting-iran-backed-militia-pentagon-says/2019/12/29/28c12e22-2a64-11ea-be79-83e793dbcaef_story.html

[13]      https://www.bbc.com/news/world-middle-east-50941693

very tough on the American forces in Iraq."[14]  This threat was directed at the very service members with whom the defendant was working side-by-side in Iraq.

In response to the airstrikes against Kata'ib Hizballah, on December 31, 2019, militia-backed protestors, led by al-Muhandis, attacked the United States embassy in Baghdad, Iraq.[15] The protestors set fire to several buildings as they chanted "death to America" and had to be repelled by United States troops before Iraqi security forces arrived.[16]

On January 3, 2020, an armed United States military drone conducted the military strike that killed Suleimani and al-Muhandis as they left the Baghdad airport.  Iran immediately vowed to retaliate against the United States.  Iran's Supreme leader, Ayatollah Khamenei, vowed that "[a] vigorous vengeance awaits those whose hands are tainted with his blood."  Lebanese Hizballah also vowed to retaliate for the attack.  The Secretary-General of Lebanese Hizballah, Hassan Nasrallah, stated that "[i]t will be the responsibility, duty, and action of all the resistance fighters and Mujahideen throughout the world to take revenge from his criminal killers who are the worst villains of this world. . . . The US killers, God willing, will not be able to achieve any of their goals with this great crime."[17]

---

[14]     *Id.*

[15]     https://time.com/5758250/qasem-soleimani-iran-retaliation/

[16]     *Id.;*   https://www.usatoday.com/in-depth/news/world/2020/01/03/iran-iraq-trump-soleimani-assassination/2803733001/

[17]     https://abcnews.go.com/International/iranian-authorities-vow-retaliation-killing-top-military-chief/story?id=68046263

On January 8, 2020, Iran retaliated for the Suleimani strike by firing more than a dozen missiles at two United States military bases in Iraq, including the same base in Erbil where the defendant was based.[18]  By this time, the defendant had already started to gather, and to disclose to her Lebanese contact, NDI classified at the SECRET level, knowing that her contact was passing this information to Lebanese Hizballah.

### b.   The Defendant's Acts of Espionage

After the defendant moved to the United States in 1986, she maintained contact with her remaining relatives in Lebanon, including her mother and siblings.  The defendant returned to Lebanon biennially to visit her family, and planned to travel to Lebanon in the summer of 2020. In 2017, a family member introduced the defendant to a Lebanese national.  This introduction was made through social media, and the defendant and the Lebanese national soon formed an on-line romance.  The defendant believed that the Lebanese national was wealthy and well-connected, and he eventually expressed an interest in marrying the defendant and having her move to Lebanon. Although she had never met her paramour in person, the defendant planned to marry him when she retired.  From 2017 until her arrest, the defendant would communicate with the Lebanese national several times a day using the video-chat feature on a secure text and voice messaging application (hereinafter "the application").  The application allowed the defendant and the Lebanese national to text each other as well as share video and pictures with each another.

Through their conversations, the defendant learned that the Lebanese national had a nephew who was a member of the Lebanese Ministry of the Interior.  She also learned that he was

---

[18]     https://www.bbc.com/news/world-middle-east-51028954

a Shia Muslim and that he claimed to have contact with members of Lebanese Hizballah. During one conversation, the Lebanese national told her that he had received a ring from Hassan Nasrallah, the secretary-general of Lebanese Hizballah. From their conversations, the Lebanese national knew that the defendant was a military linguist for the United States government, but the defendant believes he did not know where she was stationed, and she never told him where she was stationed. Prior to January 2020, the Lebanese national did not ask the defendant to provide classified information to him. That changed with the death of Suleimani and al-Muhandis.

Following the attack that killed Suleimani and al-Muhandis, the Lebanese national contacted the defendant. He was very emotional and upset about the United States airstrikes, especially the death of Suleimani, and he started to ask the defendant to provide "them" with information about the human assets that had helped the United States to target Suleimani. The defendant understood "them" to be Lebanese Hizballah, including an unnamed high-ranking military commander of Lebanese Hizballah. The Lebanese national asked her to either access the information herself, or ask other linguists for the information if the defendant did not have the requisite access.

The defendant was in a unique position to provide this information to the Lebanese national. One of the defendant's primary responsibilities in Erbil was to provide translation services for United States personnel who were developing and working with high-value human assets. Through this experience, the defendant learned about how to approach and develop assets, how to clandestinely communicate with assets, the methods the assets used to assist the United States with targeting, and whom the United States was targeting. The defendant also understood how and where information regarding these assets was stored in classified systems, and the potential vulnerabilities of the secure facility where such information was stored.

17

At the time the Lebanese national made the request for information regarding human assets, the defendant understood that Iran and its allies, Lebanese Hizballah and Kata'ib Hizballah, planned to retaliate against United States forces in Iraq and elsewhere.  Based on her training and experience, the defendant also understood the acute threat that human assets who were assisting the United States would face from entities like Lebanese Hizballah, Kata'ib Hizballah, and the IRGC.  Despite working with the United States military for more than a decade, and understanding the significant consequences of her actions, the defendant nonetheless decided to provide the classified NDI as requested by the Lebanese national.  At the time she provided this information to the Lebanese national, she understood that the information was wanted  by, and would be provided to, Lebanese Hizballah.

Following the request from the Lebanese national, in early January 2020, the defendant began to access networked DoD systems accredited to process and store NDI regarding human assets classified up to the SECRET level.  The defendant was familiar with these systems from her translation work regarding human assets.  While the defendant had legitimately accessed some of these files in her capacity as a contract linguist, she began accessing files and systems containing information regarding human assets that she knew she did not have a legitimate need to access or know.  The defendant's purpose in accessing these files was to obtain information to fulfill the requests of the Lebanese national.

Initially, the defendant used fairly crude methods to gather and disseminate the classified NDI.  The defendant began by viewing classified NDI regarding human assets in a secure area and either committing the information to her memory, or recording the information on post-it notes.  The defendant would then return to her living quarters where she would transfer the classified NDI to more detailed handwritten notes before transmitting images of the notes

containing the classified NDI to the Lebanese national using the video-chat feature of the application.  The Lebanese national would then capture the classified NDI by taking a screenshot of the video chat.

The FBI recovered one such handwritten note during a court-authorized search of the defendant's living quarters in Erbil.  The note was concealed beneath the defendant's mattress and contained handwritten content in Arabic.  The note accurately reported the true names of three human assets who were working with the United States to target a member of  Kata'ib Hizballah organization who posed a direct threat to United States forces in Iraq.  The note also instructed the Lebanese national to monitor the assets' phones and to warn the individual whom the United States was targeting.

In response to the classified NDI that he received from the defendant, the Lebanese national would regularly praise the defendant for the quality of the information she was passing to him and his Lebanese Hizballah contacts.  He told the defendant that his contacts were pleased with the information that she had provided, and that he would introduce her to the unnamed Lebanese Hizballah military commander when she came to Lebanon.  The Lebanese national then began to ask for more detailed information.  The defendant obliged, and began to create her own intelligence reports on human assets and targets by accessing different classified files, stored in different system locations, regarding the human assets and United States targets.

The government notes that the defendant did not provide every piece of information requested by the Lebanese national.  In a few instances, the defendant elected not to disclose information regarding several human assets with whom she felt she had a personal connection.  While this is facially mitigating, it also demonstrates that the defendant was acting of her own free will, and understood the acute danger to human assets that her illegal disclosures of classified NDI

created.  In fact, it demonstrates the defendant was making her own calculations as to which assets were worthy of her protection and those whom she was willing to put in harm's way.

The defendant would create her own intelligence reports by accessing classified files and folders in the secure area, and then cut and  paste information and images from different classified NDI reports into a single document.  These reports were extremely detailed, and would include information such as: photographs of the human assets, government identification cards, telephone numbers, addresses, and other information identifying the human assets; photographs taken by the human assets of potential target locations; the identities of subsources working for the human assets; and technical data regarding how the human assets were tracking and reporting the locations of potential targets.  The defendant would then bring a cellular phone into the secure area to take a picture of the detailed information regarding the human asset or target located on classified government equipment.[19]  To avoid detection, the defendant then closed the Word document containing her custom-made intelligence report, without saving the Word document, so that no record of it would remain on the classified government system.  The defendant would then send this image of the intelligence report she had created to the Lebanese national using the application. The FBI captured images of some of these reports during its investigation and confirmed that the information was taken from classified DoD systems.

In addition to the techniques used above, the defendant would also send images of communications obtained directly from human sources.  Some messages from human sources were received on tablets, and the defendant use a cellular phone to take pictures of incoming messages

---

[19]     The defendant had received guidance that cellular phones were prohibited in the secure workspace, and in any event rules and regulations prohibited photographing classified materials.

from the human assets, and would transmit those images to the Lebanese national using the application.

As she was passing information to the Lebanese national regarding human assets and targets, the defendant also passed information to him regarding the tactics, techniques, and procedures ("TTPs") that the human assets were using to gather information on behalf of the United States.  The defendant had the training and experience to understand that by passing the TTPs to the Lebanese national, Lebanese Hizballah, Kata'ib Hizballah, and others could use the information regarding the TTPs to identify human assets who were working with the United States, even if the defendant had not independently identified those human assets.

The government's review of pen register and trap and trace records ("PRTT") covering communications between the Lebanese national and the defendant reveals that the defendant continued to communicate with the Lebanese national until the evening before her arrest by the FBI in the early morning hours of February 27, 2020.

### c.   The Injury Caused by the Defendant's Acts of Espionage

As described in greater detail in the classified victim impact statement (Classified Exhibit 1) that is being filed along with the Government's Memorandum in Aid of Sentencing, the defendant passed information regarding at least  eight clandestine human assets; at least 20 U.S. targets; and multiple TTPs to Lebanese Hizballah through the Lebanese national.[20]   The defendant's actions, occurring in an active combat zone where human intelligence is at a premium,

---

[20]      During her plea hearing, the defendant acknowledged providing information regarding up to only 10 targets.  This discrepancy is a result of the defendant's focus on her claim that she specifically intended to identify only 10 targets, while the government also focused on additional targets who were named in the reports that she passed.

adversely impacted the United States military's ability to take offensive and defensive force protection measures. The timing of the defendant's conduct is also an aggravating factor. As previously discussed, American forces in Iraq were not only facing the threat of imminent retaliatory attacks, but actually had been attacked, during the time that the defendant was passing classified NDI to the Lebanese national. At this critical juncture, the defendant's actions deprived the United States of an important tool to defend its personnel in Iraq—information derived from the high-value human assets that the defendant compromised.

As described in Classified Exhibit 1, the United States had to take extensive steps to mitigate the damage caused by the defendant and to prevent harm to United States military personnel and the human assets who were compromised by the defendant.

d.   The Defendant's Mirandized Statements to the FBI

The FBI arrested the defendant on February 27, 2020. Following her arrest, the defendant provided a series of statements to the FBI after she was advised of her *Miranda* rights, which she knowingly and voluntarily waived. This was the defendant's first opportunity to mitigate the damage she had caused by revealing the identities of human assets, targets, and TTP's to a foreign terrorist organization. Far from being fully forthright, the defendant was often evasive and engaged in a cat-and-mouse game with the FBI interviewers. For example, when asked about the Lebanese national's affiliations, the defendant originally denied that he was affiliated with Lebanese Hizballah, and claimed that he was only connected to the political party Amal. The defendant also denied sending certain classified NDI to the Lebanese national, although she has since admitted to doing so. For example, during the post-arrest FBI interview, the defendant was shown a screenshot of a tablet containing a communication from a human asset, and at that time the defendant denied sending that image. The defendant also failed to acknowledge the scope of

the classified NDI that she illegally provided to the Lebanese national.  While the defendant acknowledged transmitting some of the classified NDI that the FBI confronted her about, she did not volunteer any additional disclosures.  She also omitted other critical information such as the fact that the classified NDI she provided was being sent to a high-ranking military commander in Lebanese Hizballah.  A comparison of her initial statement to the FBI and the statement of facts the defendant adopted during her guilty plea plainly demonstrates that the defendant was not forthright during her initial FBI interviews and did nothing to try to mitigate the damage caused by her conduct.[21]

      e.   The Defendant's Post-Indictment Statements to the Government Provided Some Mitigation

Following the defendant's indictment, the government provided extensive classified and unclassified discovery materials to the defense.  Before entering her guilty plea, the defendant met with the government.  The government confronted the defendant with the evidence it had collected regarding her acts of espionage, and the defendant agreed to answer questions posed to her by the FBI and DoD.  Following her guilty plea, the defendant agreed to meet with the government for a second time.  These meetings each lasted several days and involved detailed discussions of classified information and therefore are not reported in full here, but are briefly described in the attached summary (Classified Exhibit 2).[22]  The government can report that the defendant was cooperative during these sessions, that she answered all questions posed to her, and that the FBI and DoD found her responses to be generally credible.  Further, as described in Classified Exhibit

---

[21]     A redacted, unclassified transcript of the defendant's statement is attached to this sentencing memorandum as Unclassified Exhibit 3.

[22]     Redacted, unclassified versions of Classified Exhibits 1 and 2 are attached as Unclassified Exhibit 4.

2, the DoD was able to take certain remedial steps including force protection measures based on the information provided by the defendant.

**B.      18 U.S.C. § 3553 (a)(2)(A) – Reflecting the Seriousness of the Offense**

The offense that the defendant pleaded guilty to, a violation of 18 U.S.C. § 794, is among the most serious crimes in the Federal Code.  This reflects a considered judgment on the part of Congress to forcefully punish individuals who betray this nation.  Therefore, the statutory penalty is up to life in prison, and if "the offense resulted in the identification by a foreign power . . . of an individual acting as an agent of the United States and consequently in the death of that individual," this is a death eligible offense.  The defendant's punishment should reflect how serious this crime truly is both in light of its statutory penalty and the underlying facts of this case.[23]

The Guidelines also reflect the seriousness of this offense, as evidenced by the fact that the defendant's Guidelines sentence is life in prison.  Even if the defendant had not transferred classified NDI to a foreign terrorist organization, the defendant would still be facing a sentence of 188–235 months.[24]  The terrorism enhancement plays an important role in properly calculating the Guidelines range in this case because it is significant that the defendant decided to provide classified NDI to a foreign terrorist organization.  By definition, a foreign terrorist organization 1) engages in terrorist activity including hijacking or sabotaging conveyances; seizing, detaining, and threatening to kill individuals to compel government action; assassination; the use of biological

---

[23]      The government is not aware of any information that would make this case death-penalty eligible.

[24]      This calculation assumes a base offense level of 37, plus two levels for abuse of a position of trust, minus three levels for cooperation, resulting in an offense level of 36, and a Criminal History Category of I.

agents, chemical agents, nuclear weapons, explosives, firearms, or other weapons with the intent to harm persons or property;  and 2) the terrorist activities threaten the security of the United States and United States nationals.[25]

Thus, providing classified NDI to terrorist organizations like Lebanese Hizballah and Kata'ib Hizballah poses an even greater, unpredictable threat to United States interests because the activities of designated foreign terrorist organizations are assumed to jeopardize the security of United States nationals or the national security of the United States.  The defendant's decision to provide classified NDI to a terrorist organization rather than simply to a foreign nation, therefore, merits the heightened guidelines range resulting from the application of the terrorism enhancement.  The resulting Guidelines sentence of life imprisonment reflects the inherent danger of passing classified NDI to a foreign terrorist organization.  This rationale is particularly true here where the defendant, based on her experience and assignments in Iraq, was acutely aware of the relationship between Lebanese Hizballah and Kata'ib Hizballah and the imminent threat they posed to the United States forces with whom the defendant served.  Further, the defendant had no illusions about the foreign terrorist organization she was passing information to.  In her interview with the FBI, the FBI asked the defendant to explain her understanding of Lebanese Hizballah. The defendant explained that Hizballah was "bad," that they "kill people."  According to the defendant, "they can kidnap you and kill you and nobody know where you are."  The defendant stated that "you can describe them like a terrorist organization"  and that Lebanese Hizballah is "like the octopus.  They can reach anybody."

---

[25]     8 U.S.C. § 1189(a)(1) (incorporating definition of terrorist activity contained in 8 U.S.C. § 1182(a)(3)(B)).

### C.      18 U.S.C. § 3553 (a)(2)(B) – Adequate Deterrence to Criminal Conduct

The defendant should be sentenced to 30 years of imprisonment for purposes of deterrence, both general and specific.  As for general deterrence, there are millions of current and former security clearance holders in this country and serving abroad, which include full-time government employees as well as government contractors such as the defendant.  All clearance holders enter into similar non-disclosure agreements to the ones the defendant signed over the course of her career.  Fortunately, the vast majority of clearance holders uphold those obligations faithfully. Yet for anyone considering violating those agreements, as the defendant did, there should be a powerful message sent that providing our secrets to a foreign adversary, particularly a foreign terrorist organization, will be met with the harshest of punishments.  A term of imprisonment of 30 years in this particular case also serves to remind all clearance holders of the importance of their obligation to safeguard government secrets and protect the national security.

As to specific deterrence for this defendant, the defendant no longer has access to classified information, and has repeatedly expressed remorse regarding her conduct.  However, as described in the classified victim impact statement (Classified Exhibit 1), the defendant's memory still holds valuable NDI classified up to the TS//SCI level, including the identities of additional human assets she elected not to disclose.  Further, having spent over a decade as a contract linguist, the defendant knows the names, code names, physical characteristics, and in some cases personal information about United States government personnel who are still serving in the field, some in covert roles.  Given the defendant's previous conduct, a lengthy sentence of imprisonment where the defendant's communication privileges are restricted and monitored is the only way to ensure that the defendant does not have the opportunity to divulge additional classified information in the foreseeable future.

### D.     18 U.S.C. § 3553 (a)(2)(C) – Protect the Public from Further Crimes of the Defendant

A sentence should also be imposed to protect the public from further crimes of the defendant. As discussed above, the defendant still retains SECRET and TS//SCI classified NDI in her head. Disclosure of this information would further jeopardize the safety of the human assets that the defendant has not previously divulged, as well as the safety of the United Sates government personnel who regularly interact with such assets. (*See* Classified Exhibit 1). As noted above, the defendant also retains information as to the identities of DoD personnel who remain in service to this country, many in active conflict zones. If the defendant were to divulge this information to any third-party, it would immediately place the lives of those personnel at risk. While the defendant has repeatedly stated that she did not identify any United States personnel and would never do so, that assurance provides little comfort considering the defendant's profound betrayal of the trust that United States government personnel previously placed in the defendant.

### E.     18 U.S.C. § 3553 (a)(6) – Avoiding Unwarranted Sentencing Disparities

A final sentencing factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The defendant's case is atypical of espionage cases. As discussed below, many espionage defendants are motivated by financial rewards, however, in this case there is no evidence that the defendant requested or received any financial compensation.[26] Further, the defendant's decision to furnish classified NDI to a designated foreign terrorist organization also distinguishes this case

---

[26]     The closest the defendant came to any sort of remuneration was the promise of a comfortable retirement lifestyle in Lebanon once she married her Lebanese contact.

from most prior espionage cases where defendants provided classified NDI to a foreign government, not a terrorist organization. Finally, while many espionage cases involve illegal conduct occurring over a protracted period, the defendant's illegal conduct ended with her arrest after nearly two months of illegal conduct. Despite these differences, it is clear that espionage convictions are dealt with seriously, and that defendants who commit espionage offenses serve lengthy jail terms.

One of the most comparable cases to that of the defendant is found in *United States v. Ryan Anderson*, 68 M.J. 378 (C.A.A.F. 2010). Anderson was a Washington State national guardsman whose unit was scheduled to deploy to Iraq in 2004. Prior to the deployment, Anderson began to post comments and pictures on an extremist Muslim website. Soon, Anderson began to exchange emails with an individual whom he believed was a Muslim extremist. The emails described how his unit was trained to detect potential suicide bombers, and details regarding his unit's deployment. *Id.* at 381. The individual who was communicating with Anderson was not, in fact, a Muslim extremist, and the individual reported Anderson's conduct to the FBI.

The FBI and military investigators initiated a sting operation, posing as members of Al-Qaeda, a designated foreign terrorist organization. Anderson met with the undercover agents posing as Al-Qaeda members and provided them with classified information regarding the vulnerabilities of various military vehicles and the vulnerabilities of his unit. Anderson also provided drawings showing the vulnerabilities of different combat tanks, and described how to force a tank crew to abandon their vehicle so they could be killed. *Id.* Anderson was convicted at a general court martial of attempting to give intelligence to the enemy, two specifications of attempting to communicate with the enemy, one specification of attempting to aid the enemy, and one specification of wrongfully and dishonorably providing information to military personnel

whom he believed were terrorists.  *Id.* at 380.  Anderson was sentenced to confinement for life with the possibility of parole.  *Id.*  While *Anderson* did not involve human assets, it did involve the attempted disclosure of classified information that would have exposed United States service members to risk of harm in a combat zone.  Further, like the defendant here, Anderson's acts of attempted espionage were motivated by personal reasons, not financial benefit.  Anderson received a life sentence even though he never successfully passed information, while the defendant here successfully passed a large volume of classified information to the Lebanese national believing it would be passed to Lebanese Hizballah.

*United States v. Ana Belen Montes,* No. 1:02-CR-131 (D.D.C.) (Urbina, J.), also offers a helpful comparison from this district.  Montes was a Department of Justice employee before becoming a senior analyst for the Defense Intelligence Agency (DIA), specializing in Cuban intelligence.  However, as indicated in her guilty plea, for 16 years the defendant acted as a spy for the government of Cuba before her arrest in 2001.[27]  Between 1994 and 1997, Montes provided the government of Cuba with NDI classified at the SECRET level which identified four different covert Central Intelligence Agency intelligence officers.  In addition, throughout her service to the government of Cuba, Montes also provided the Cuban government with NDI classified at the TS//SCI level.  At the time Montes was providing classified materials to Cuba, the Secretary of State had designated Cuba as a state sponsor of terrorism.  Montes pleaded guilty to conspiracy to commit espionage in violation of 18 U.S.C. § 794 (a) and (c) pursuant to a cooperation agreement and was sentenced to 25 years of imprisonment following a Rule 11(c)(1)(C) plea.  As was the

---

[27]     Montes's guilty plea is available at Docket Number 42 of case number 02-CR-131 (D.D.C., Mar. 19, 2002).

case with Anderson and the defendant here, Montes was not motivated by financial gain.  While Montes did engage in acts of espionage over a much greater period, and successfully passed information to Cuba, she only passed information regarding four human assets, far fewer than the defendant.

Two other cases from this district also demonstrate that lengthy sentences are common in espionage cases.  In *United States v. Walter Kendall Myers,* 1:09-CR-150 (D.D.C.) (Walton, J.), Myers, a career Department of State employee, spied for Cuba for purely ideological reasons.  For over 30 years, Myers passed NDI classified at the SECRET and TS//SCI levels to his Cuban handlers.  According to the statement of offense, while Myers gathered information about human sources, there was no evidence that he actually transmitted human source information to Cuba.[28] Myers pled guilty to conspiracy to commit espionage in violation of 18 U.S.C. §§ 794 (a) and (c) and wire fraud in violation of 18 U.S.C. § 1343, pursuant to a cooperation agreement and was sentenced to life imprisonment following a Rule 11(c)(1)(C) plea.

Finally, perhaps the best-known espionage case from this district is *United States v. Jonathan Pollard,* 959 F.2d 1011, 1015-16 (D.C. Cir. 1992), where the defendant, a Naval intelligence officer, delivered classified NDI to Israeli government agents for approximately 18 months before his arrest.  While Pollard was not initially paid for this information, he eventually started to accept monetary compensation from his handlers.  Pollard pleaded guilty to conspiracy

---

[28]     Statement of Offense at 9-10.  Myers's guilty plea and statement of offense are available at Docket Numbers 45 and 46 of case number 1:09-CR-150 (Nov. 20, 2009).

to deliver national defense information to a foreign government in violation of 18 U.S.C. § 794(c) pursuant to a cooperation agreement, and was sentenced to life in prison.[29] *Id.* at 1017-18.

There are several similarities between the defendant's case and *Montes, Meyers,* and *Pollard.* Each of these cases involved the transfer of extremely sensitive classified NDI by individuals who had been entrusted with such information as a security clearance holder; each defendant, to some degree, cooperated with the government following their arrest; and each of the defendants was motivated, at least initially, by non-financial reasons. Significantly, *Montes, Meyers,* and *Pollard* all received lengthy jail terms even though their acts of espionage were not exacerbated by passing human asset and targeting information to a foreign terrorist organization.[30]

A recent espionage case in the Eastern District of Virginia highlights the significance of espionage involving classified NDI regarding human assets. *United States v. Kevin Mallory,* 1:17-CR-00154 (E.D. Va.) (Ellis, J.), involved a defendant who worked for the United States government as a covert case officer for the CIA and then as a senior intelligence officer for the DIA where he had access to NDI classified up to the TS//SCI level. Mallory's clearances provided him with access to NDI regarding human assets and other highly sensitive information. Following

---

[29]     At the time of Pollard's sentence, which was prior to the Sentencing Reform Act of 1984, defendants sentenced to life in prison were eligible for mandatory parole after serving 30 years of their sentence. 18 U.S.C. § 4206(d). Pollard was paroled after serving 30 years of his life sentence.

[30]     The two other recent espionage prosecutions in this district that did not involve completed acts of espionage are *United States v. Stewart Nozette*, No. 1:9-CR-276 (D.D.C.) (Friedman, J.) (defendant sentenced to 13 years under 11(c)(1)(C) plea for attempted espionage involving classified satellite technology) and *United States Bryan Underwood*, No. 1:11-CR-261 (D.D.C.) (Huvelle, J.) (defendant sentenced to nine years for attempting to provide classified information regarding U.S. Consulate construction and design to Chinese intelligence officers).

his retirement from government service, Mallory began to sell classified NDI to the Chinese government and lied about it when confronted by the FBI.  Mallory did not cooperate or enter a guilty plea, but was convicted following trial of conspiracy to gather or deliver NDI to aid a foreign government in violation of 18 U.S.C. § 794(c), and making material false statements in violation of 18 U.S.C. § 1001(a)(2).[31]  The court calculated Mallory's guideline range to be life, but imposed a sentence of 20 years.  Judge Ellis's decision not to impose a life sentence was influenced by his inability to find that Mallory had actually revealed the identity of human assets to the Chinese, but he made clear that "[i]f [he] had concluded that sources had been compromised, as did occur in the Aldrich Ames case, and in other cases, [he] would impose a far more severe sentence." *Mallory*, No. 1:17-CR-00154, Sent. Tr. at  47 (Jul. 3, 2019).[32]  Judge Ellis recognized that when classified information regarding human assets is disclosed, "a defendant who conveys or attempts to convey information that would identify [ ] human sources in another country has done something really serious, because these sources are retaliated against, they're killed."  *Id.* at 6-7.

Other recent espionage cases also make clear that courts consistently impose lengthy jail terms for acts of espionage.  For example, *United States v. Brian Patrick Regan*, 228 F. Supp.2d 742 (E.D. Va. 2002), involved a defendant  convicted of violations of 18 U.S.C. § 794.  Regan was a member of the United States Air Force who, between mid-1999 and August 2001, while working

---

[31]     The jury convicted the defendant of two additional counts, however, the court dismissed those counts post-trial after finding there was insufficient evidence of venue.  *See United States v. Mallory*, 343 F. Supp. 3d 570, 571 (E.D. Va. 2018) (describing procedural history of verdict and post-trial motions).

[32]     Aldrich Ames was a CIA Agent who became a double agent for the former Soviet Union's KGB.  Ames provided the KGB with information regarding human assets that led to the arrest and execution of multiple assets in the Soviet Union.  Ames was, thus, death penalty eligible. In 1994, Ames was sentenced to life without the possibility of parole.

at the National Reconnaissance Office, obtained classified intelligence related to the military preparedness of Iran, Libya, Iraq, and the People's Republic of China.  Regan attempted to sell this Top Secret information to Iraq, Libya, and China.  *Id.* at 745.  Following his conviction at trial for two counts of attempted espionage in violation of § 794(a) and one count of obtaining information respecting the national defense of the United States with intent to cause injury to the U.S. and advantage to a foreign country in violation of 18 U.S.C. § 793(b), Regan was sentenced to life in prison.

In *Pitts*, a former FBI agent pleaded guilty to two counts of violating 18 USC § 794.  Pitts "betrayed his country by becoming an agent of the KGB," and by passing "unclassified and classified material to his KGB and SVRR 'handlers,'" for which he was paid at least $129,000.  *Id.* at 577-78.  Pitts was also the subject of a "false flag" operation where he provided additional information to those he believed to be Russian contacts, but who were, in fact, "undercover FBI agents pretending to be SVRR officers." *Id.* at 578.  The *Pitts* court found that the Guidelines range for Pitts was 262-327 months, and sentenced him to near the top of that range – 324 months in prison.  *Id.* at 584.  In imposing sentence, the court noted that Pitts had abused a position of trust because he was "a supervisory special agent of the FBI" and "a foreign counterintelligence operative."  *Id*. at 583.

Finally, in *United States v. Robert Hoffman*, 2:12-cr-184 (E.D. Va. 2014) (Doumar, J.), the defendant, a former cryptologic technician with the U.S. Navy, divulged classified information to undercover FBI agents posing as Russian intelligence officers after expressing his desire to be compensated in the form of job assistance or payments.  In response to undercover agents' questions, Hoffman provided written responses that contained NDI classified at the levels of SECRET and TS//SCI.  Following a five-day trial, a jury convicted Hoffman of one count of attempted espionage, in violation of § 794(a).  Under U.S.S.G. § 2M3.1, Hoffman's offense level was 42, which resulted

in a guidelines range of 360 months to life imprisonment. Hoffman was sentenced to 360 months in prison.

In light of these cases and considering the defendant's actions in this case where she actually transmitted NDI relating to specific military assets, a guidelines sentence of life imprisonment, or the government's recommended sentence of 30 years imprisonment, avoids any unwarranted sentencing disparities.

**F.**     The Court Should Vary from the Guidelines and Impose a Sentence of 30 Years of Imprisonment

For all the reasons discussed above, a sentence of life imprisonment would be justifiable in this case under the Guidelines and the sentencing factors enumerated in § 3553.   However, several   facts may support the conclusion that   a sentence of 30 years imprisonment is more appropriate in this case.   Under § 3553 (a)(1), the Court must consider the characteristics of the defendant and nature and   circumstances of the offense, including the duration of the defendant's criminal conduct, the defendant's age, her prior service to the United States military, and the defendant's assistance to the government.

As previously discussed, the defendant's case is atypical because the period in which she engaged in her acts of espionage was measured in weeks not years.   While this is clearly a pertinent factor, it is unclear whether the defendant had decided to stop providing information to the Lebanese national as she claims, or whether the herculean efforts of the FBI and DoD to identify, disrupt, and mitigate her acts of espionage are solely responsible for the limited duration and impact of the defendant's betrayal.   The PRTT records documenting the communications between the defendant and the Lebanese national are arguably inconsistent with the defendant's claim that she had clearly told the Lebanese national that she was ending the relationship.   PRTT records

show over 60 exchanges between the two on the day before her arrest, including text, image, and voice call exchanges.[33]

The defendant's age is also a relevant factor for purposes of this sentencing.  The defendant is 62 years old.  There are a limited number of espionage cases, and there is no clear correlation between age and sentencing.[34]  The defendant's peers in terms of age are distinguishable because they engaged in espionage for long periods of time (Myers), or were arrested before they could continue to engage in further acts of espionage that revealed human assets (Mallory).  Looking at other comparable espionage defendants who received life sentences, the defendant's age is a distinguishing feature compared to Anderson (mid 20s); Pollard (early 30s); and Regan (early 40s).

In deciding the defendant's sentence, this Court should also consider the defendant's prior service to the United States military.  The defendant did not serve as an enlisted member of the United States military, however, she served alongside the United States military for more than a decade, often in active combat zones such as Afghanistan, Iraq, and Syria.  Prior to her betrayal, the defendant was respected by many in the military with whom she worked, many referring to her as "Mama Mary."  The defendant was valuable to the United States military for both her translation skills, and her personal touch with many human assets and their family members.

Finally, as previously discussed in this memorandum, and discussed further in Classified Exhibit 2, the defendant's decision to cooperate with the government's investigation after she

---

[33]      The PRTT records do not contain the substance of these communications.

[34]      In the primary espionage cases previously discussed, the defendants were of varying ages at the time of sentencing and received varying sentences, Montes—mid 40s, 25 years; Myers—early 70s, life; Pollard—early 30s, life; Anderson—mid 20s, life; Mallory—early 60s, 20 years; Regan—early 40s, life; Pitts—mid 40s, 27 years; Hoffman-40, 27 years.

retained counsel and had an opportunity to view the government's evidence was beneficial.  While this assistance would have been of greater value had the defendant immediately provided the information to the FBI upon her arrest, her assistance nonetheless furthered the government's investigation, provided DoD with information that assisted with force protection measures, and helped the FBI and DoD to mitigate the damage her acts of betrayal caused.

In combination, these mitigating circumstances support a variance below the guidelines sentence of life, to a sentence of 30 years of imprisonment.

## IV.   CONCLUSION

The sentencing in this case is challenging.  Prior to 2020, the defendant presents a compelling story of personal struggle, finding a new beginning in the United States, and providing her adopted homeland with valuable service.  The government appreciates that the sentence it is requesting arises from conduct occurring during a brief period of the defendant's life.  Nevertheless, the government recommends a 30-year sentence, and urges this Court to follow its recommendation, based on all of the factors discussed above.  The defendant did not commit acts of espionage from the safety of her home or office in the United States, she did so in the middle of an active combat zone, where the very terrorist organizations that she was knowingly assisting had made clear their intention to harm United States military personnel.  The defendant knew that these were not idle threats, as demonstrated by the January 8, 2020, missile attack that targeted American bases, including the base where the defendant was stationed in Erbil.  Despite the clear and present dangers facing the United States and its allies in the region, the defendant knowingly betrayed her country and put lives at risk by providing classified NDI to a designated foreign terrorist organization.  That betrayal merits the substantial sentence requested by the government.

36

For the foregoing reasons, and any additional evidence or argument presented at the sentencing hearing in this matter, the government strongly recommends that this Court impose a sentence of 30 years of incarceration.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar No. 415793

By:   /s/ *John Cummings*
John Cummings
D.C. Bar No. 986573
Special Assistant United States Attorney
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 809-8672
John.Cummings@usdoj.gov

/s/ *Jennifer Kennedy Gellie*
Jennifer Kennedy Gellie
D.C. Bar No. 1020976
Deputy Chief
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC  20530
(202) 233-0785
jennifer.gellie@usdoj.gov