UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES )<br>)<br>v. )<br>) Criminal No. 20-CR-0067<br>MARIAM TAHA THOMPSON )<br>)<br>) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Mariam Thompson, by and through undersigned counsel, respectfully files this Memorandum in Aid of Sentencing. Ms. Thompson is extraordinarily remorseful for her actions and has accepted responsibility for them. She has entered a plea of guilty to one count of Conspiracy to Gather or Deliver Defense Information to Aid a Foreign Government, in violation of 18 U.S.C. § 794(a) and (c) and is before the Court for sentencing. *See generally* PSR.

Ms. Thompson is sixty-two (62) years old, was born in Beirut, Lebanon, and is the fourth of ten children. *See* PSR ¶ 47. She grew up extremely poor and began working at the age of nine, doing domestic work with her mother. *Id*. at 49. However, she was determined to make her dreams a reality. She emigrated to the U.S. in 1990, became a citizen in 1993, and continued to raise her four children and build her career. *Id*. at ¶ 53, 55. After her husband died in 2002, she worked at various times in different capacities in and around the Middle East, including in Iraq, Afghanistan, Kuwait, and Syria. *Id* at 53. Her life is defined by her culture, her love for food and family, and most notably, her lovely grandchildren.

Ms. Thompson submits sixteen (16) letters of support for the Court to consider in determining its sentence in this case. Each letter gives the Court a more complete understanding of Ms. Thompson. *See* Exhibits B-P. Based upon Ms. Thompson's personal history and

y
z
a

character, and the nature and circumstances of the offense, Ms. Thompson respectfully requests that the Court impose a sentence significantly below the low-end of the guidelines in this case. Such a sentence would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing.[1]

## I. THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *Id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *Gall* at 49-50, and explain how the facts relate to the purposes of sentencing. *Id.* at 53-60; *See also Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough* at 101; *Pepper* at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (holding

---

[1] *See* 18 U.S.C. § 3553(a).

q

that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper* at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006).  Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## II.     THE UNITED STATES SENTENCING GUIDELINES

In accordance with the PSR in this matter, the parties agree that the following Sentencing Guidelines sections apply: *See* PSR ¶ 5 and ¶ 29-39.

**2018 Guidelines**

| | |
|---|---:|
| USSG § 2M3.1(a)(2) – Base Offense Level | 37 |
| USSG § 3A1.4(a) – Victim Related Adjustment - Terrorism | +12 |
| USSG § 3B1.3 – Role Adjustment – Position of Trust | +2 |

3

|  |  |
|---|---|
| Total | 51 |
| Acceptance of Responsibility USSG §3E1.1(a) | -2 |
| Acceptance of Responsibility USSG §3E1.1(b) | -1 |
| **SUBTOTAL OFFENSE LEVEL** | **48** |

Pursuant to Chapter 5, Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.

**TOTAL OFFENSE LEVEL**                                                                 **43**

Ms. Thompson has a criminal history score of zero which would usually yield a criminal history category of I for sentencing purposes. *See* PSR ¶ 42. However, pursuant to USSG § 3A1.4(b), if the offense involved a federal crime of terrorism, the criminal history category is VI. These calculations, with a total offense level of forty-three (43) and a criminal history category of VI, would result in an advisory Guidelines range for Ms. Thompson of life. *See* USSG Sentencing Table; *see also* PSR ¶ 91.

**III.   18 U.S.C. § 3553(A) FACTORS**

    **A.  The Nature and Circumstances of the Offense.**

Ms. Thompson's involvement in the instant offense is extraordinarily regrettable. As stated in Ms. Thompson's letter to the Court, "I fully accept responsibility for my actions. I am not proud of what I have done, and am filled with sadness and regret for what happened." *See* Exhibit A. Ms. Thompson is proud of her service to the United States as she writes, "I participated in thousands of missions and raids side by side with our soldiers, and helped save lives." *Id*. She was respected, loved, and admired for her work overseas, and as she puts it, she was the "ears and tongues in the war against terrorism." *Id*. Ms. Thompson received several letters of recommendation from Generals for her professionalism and bravery. *See* Exhibits M-N.

4

In discussing the instant offense, Ms. Thompson explains that she "figured that I was getting old with no one to hold me when I cry or to warm me with love and care. I needed love." *Id*. She was naïve and fell for the empty promises of a "smiling future" with a master manipulator who took advantage of her and convinced her to commit the greatest mistake of her life. *Id*. Ms. Thompson asks the court "for mercy," and to "give me time to spend with my children and grandchildren in the end of my years." *Id*. Ms. Thompson is incredibly remorseful for the damage she has caused to this country, and the embarrassment her actions have brought upon her country, her family, and herself.

While Ms. Thompson takes complete responsibility for her actions, it is important for the Court to understand the context and nature of how the offense occurred. Ms. Thompson was happily married to her husband for seventeen (17) years until his tragic passing from cancer in 2002. Following his death, Ms. Thompson became involved in an abusive relationship that lasted only six months. Afterwards, Ms. Thompson refocused her attention on her career, children, and grandchildren. In 2017, many years later, as Ms. Thompson entered older age and was working overseas, she met the unindicted co-conspirator which ultimately led to the instant offense. It was not until late early January 2020 that the man convinced Ms. Thompson to engage in the conduct described in the Statement of Facts.  Her criminal conduct encompassed less than sixty (60) days.

To put it simply, Ms. Thompson was lonely and fell in love with a master manipulator who convinced her to make the biggest mistakes of her life. Ms. Thompson's good-hearted nature, selfless personality, and vulnerability  made her a perfect target for manipulation. It does not excuse Ms. Thompson's actions, but it does provide necessary context to understand how a

woman with such an impeccable and impressive background stands before this Court today facing some of the most severe consequences under the law.

### B. Mariam Thompson' History and Characteristics.

Simply put, Mariam Thompson is beloved by her family, friends, and co-workers, as evidenced by the sixteen (16) letters of support submitted as part of this memorandum on her behalf. *See* Exhibits B-P. The letters paint a picture of a woman who is well respected, loved, and admired for her dedication to her family and her work. *Id*.

Arthur Thompson, Ms. Thompson's eldest son, writes that his mother's "heart is big and she is always thinking about everyone around her rather than thinking of herself." *See* Exhibit B. Understanding that the charges are "severe," Mr. Thompson believes that "given the chance, she would help the community" because she is "an outstanding member of society." *Id*. "The offense she is charged with is something that took everyone by surprise." *Id*. Mr. Thompson recalls his mother calling her soldiers "family," and sacrificing vacations so she could stay and perform her duties. *Id*. He still struggles with the realities of this offense as he writes that "her love for the military and the US is beyond what a regular person would have." *Id*. Mr. Thompson despises the person who took advantage of his mother, calling him "evil." *Id*. He urges the Court for its leniency in fashioning an appropriate sentence, saying "please let her see her grandkids outside the walls of a prison." *Id*.

Daniel Thompson, another of Ms. Thompson's sons, writes how "shocked" he was upon hearing of his mother's arrest, not only because it "was out character," but because "she has always been a kind and respectful, law abiding citizen, who made sure to enforce these habits within me." *See* Exhibit C. Daniel paints a picture for the Court of a woman who is generous and kind and "loves cooking food for anyone and everyone." *Id*. He has fond memories of his

6

mother, hosting family and friends at the house, or even selling "homemade foods at the fair." *Id*. Daniel is grateful and admires that Ms. Thompson "always worked to provide for her family," and during her work overseas, "she always expressed her pride in being American." *Id*. During every conversation Daniel has had with Ms. Thompson during her incarceration, "her remorse and sorrow ring true." *Id*.

Michael Thompson, Ms. Thompson's youngest son, writes about how hard-working his mother is and how much he appreciates all of her sacrifice. *See* Exhibit D. "When I was a kid and my father passed away, my mom not only was my hard-working mother, but she was also being the father – taking care of all four of her kids and my grandma." *Id*. Ms. Thompson was "working 5 jobs." *Id*. Michael makes an interesting observation about Ms. Thompson – that she "has always been helping her family and friends to the point that she never truly loved herself." *Id*. This provides context to how Ms. Thompson got caught up in the instant offense and why she was the perfect vulnerable target for espionage recruitment.

Michael writes that his mother "is the reason why I got sober and she is the reason why I'm going to be graduating from nursing school." *Id*. Michael expresses the sorrow he feels about his mother's situation. "Listening to her cry every phone call we have and hearing her ask if her own mother is dead yet has broken me more than the death of my father." *Id*. "I wake up every night screaming, feeling like I can't breathe, knowing that I lost the last person who has ever cared for me." *Id*.

Ms. Thompson's brother, Kayed Taha, adds that his sister is a "good and wonderful woman," who "spent her whole life working to help her family," never asking anyone for anything in return. *See* Exhibit E. He simply asks the Court to "give my sister a chance." *Id*.

Sarah Thompson wrote a heartfelt letter explaining to the Court how her "mom means the

7

world to me." *See* Exhibit F. Sarah paints a picture of a "selfless" woman who loved being a part of her community, taking part in fairs and volunteering to those being treated at the Mayo Clinic in Rochester, Minnesota. *Id*. Ms. Thompson has a passion for cooking, and Sarah talks about her mom's cooking always impressing the neighbors and the community. *Id*. In addition to being a great cook, Ms. Thompson loved to have "time of quiet reflection" fishing at lakes nearby with her family. *Id*. Sarah explains that her "mother has lost everything," "is very remorseful, feels ashamed, and is very aware of the magnitude of her actions and the effect that it has had on her family, friends, and country." *Id*.

A longtime family friend, Cristina Adams, has known Ms. Thompson for over ten (10) years, and has always known her "to be very generous to her family, providing both financial and emotional support to her children and grandchildren." *See* Exhibit G. Ms. Adams describes the instance offense as both "shocking and egregious," but that the "Mariam I knew would never have done anything to hurt the U.S." *Id*. Ms. Adams knew Ms. Thompson to reference America as "my country." Ms. Adams believes the only explanation to Ms. Thompson's offense is that "she was coerced and manipulated by evil persons," and that the offense is "totally out of character for the intelligence and humble woman I knew." *Id*. Ms. Adams is confident Ms. Thompson is remorseful and despite everything, still believes that Ms. Thompson is "an honorable individual, a valuable member of society, and a good human being." *Id*.

A close family member of over ten (10) years, Jessica Adams writes that "I never in 1000 years thought that Mariam would be a part of something like this." *See* Exhibit H. In all the time Ms. Adams has known Ms. Thompson, she "has been a very thoughtful, caring, giving, loving, and helpful part of our family." *Id*. She also believes that "Mariam was manipulated by a master manipulator." *Id*. And although "she is very smart … she is naïve to an extent." *Id*. Ms. Adams

tells of Ms. Thompson always making time for daily phone and Facetime calls with her grandchildren, and "thinking about these kids not having their grandma as they grow up is devastating." *Id*. Ms. Adams would "bet my life that Mariam would never commit another crime again" and only wants "Mariam to be part of the family again." *Id*.

Lori Adams and Ms. Thompson are both grandmothers to two young children and have known each other for over thirty (30) years. *See* Exhibit I. Ms. Adams recalls times visiting Ms. Thompson's home over the years, enjoying the generosity of food and company Ms. Thompson's family provided. "Her home was comfortable and inviting and I enjoyed our visits." *Id*. Ms. Adams describes Ms. Thompson as "an incredibly generous friend, mother, sister, and grandmother," adding that "the grandchildren adore her," and "celebrations haven't been the same without her." *Id*. In reference to the instant offense, Ms. Adams states that "this has been a horrific tragedy; a mistake that she wishes she could reverse." Ms. Adams also believes in her heart that Ms. Thompson was manipulated, saying "I feel Mariam did not know what she was getting herself into." *Id*. Ms. Adams "prays for her freedom and the chance to have her back into the family." *Id*.

Nicole Adams is Ms. Thompson's future daughter in law and the mother to Ms. Thompson's two grandchildren. *See* Exhibit J. Ms. Adams unequivocally states that while she "cannot excuse her behavior," "this is completely out of character for the woman I know and love." *Id*. "She is the one of the most loving, caring, and hardworking people I've ever met." *Id*. Ms. Adams gives examples of how incredible of a grandmother Ms. Thompson is and how hard it's been on her children, ages three and four, to not have their grandma around. *Id*. "Mariam loved singing to the kids … enjoying a movie … rocking my daughter to sleep …" *Id*. Ms. Adams asks the court for "leniency when sentencing Mariam," because she has "no doubt she

will work extremely hard to make this right." "She's a good person who has many people that love her and will hold her accountable." *Id*.

Jan Wale, a friend for thirty years met Ms. Thompson while she was an interpreter at the Mayo Clinic in Minnesota. *See* Exhibit O. She has many fond memories, remembering when they "visited each other's homes, celebrated family events, and enjoyed learning about each other's cultures." *Id*. When Ms. Thompson's husband passed away, Ms. Wale and her family were there to help support Ms. Thompson and they remember her working extremely hard to support her family in every way she could. *Id*. "Hard work and ingenuity, combined with a lively sense of humor, seemed to be trademarks of her personality." *Id*. Ms. Wale has always been grateful for Ms. Thompson's "exceptional kindness and generosity" towards her aging parents, often bringing them gifts and sharing stories of laughter. *Id*. Like many others that support Ms. Thompson, they are "stunned" by her current situation, and "are convinced the events which led to this were orchestrated by people seeking to take advantage of her." *Id*.

Lowell Dale, another friend of Ms. Thompson's for over thirty (30) years, writes that he has "always been impressed by Mariam's resilience to challenges presented to her and her work ethic to accomplish the new goals she set for herself." *See* Exhibit P. Mr. Dale first met Ms. Thompson at the Mayo Clinic, where he treated the member of the Saudi royal family Ms. Thompson worked for, and later treated Ms. Thompson, her now deceased husband, and her children. *Id*. Mr. Dale always "admired her dedication to her children." *Id*. Mr. Dale shares the same affection towards Ms. Thompson that many others do – and expressed feelings generated by interactions with her as "warm, sincere, kind, generous, hardworking, dedicated, full of life, energy, and ambition." *Id*. Mr. Dale looks forward to "re-establishing my relationship with her" upon the completion of her sentence. *Id*.

10

Robert Heston, a career military intelligence officer of thirty-one (31) years with an incredible record of service to the United States, writes that he was "shocked" to hear about Ms. Thompson's arrest because he felt it "was so out of character." *See* Exhibit K.  Mr. Heston worked for a year in Afghanistan with Ms. Thompson in her role as a cultural advisor and felt this way in particular because of the way he "saw her handle classified materials and discussions around those who were not privy to the things we were directly involved with." *Id*. Mr. Heston has been tasked on many occasions in his career to form and lead teams for "difficult, highly classified work." *Id*. He expresses to the Court that not only was Ms. Thompson chosen to be a part of one of these teams, but that he would still choose her today. *Id*. Mr. Heston sympathizes with Ms. Thompson and believes that she "fell victim to someone, a scheme, a sweet talker." *Id*. Mr. Heston believes that this experience "would be nothing less than a constant reminder to do better, to move forward, and to live up to the family values she so often shared with me when we worked together." *Id*.

A coworker and retired Army Nurse, Catherine Haverty was "shocked" upon learning of Ms. Thompson's offense and has "always considered her to be extremely honest and trustworthy, and this action seems totally out of character for her." *See* Exhibit L. Ms. Thompson served as Ms. Haverty's interpreter in Iraq where they provided medical services to many Iraqi woman and children. Ms. Haverty recalls Ms. Thompson as "excellent at performing any task" including "performing first aid and nursing duties." *Id*. Even during war, Ms. Thompson "was always cheerful and upbeat," and "remained calm no matter the circumstance." *Id*. Ms. Haverty has much respect for Ms. Thompson, explaining that "she loves her family dearly and has taken very good care of them for many years." *Id*. She recalls a time when their vehicles were hit with IEDs and there were casualties, and Ms. Thompson went "above and beyond what was expected of

11

her" by assisting "with the retrieval of the soldier's remains to be sent to their families at home." *Id*. Ms. Haverty pleas the Court for its leniency in sentencing her in this matter. *Id*.

Ms. Thompson's record of service to the United States was impeccable and impressive, so much so that General David Petraeus wrote a letter of endorsement for her in 2010. *See* Exhibit M. General Petraeus wrote that Ms. Thompson is "a superb example of integrity, loyalty, and professionalism," and that she "truly knows her craft." *Id*. She was critical to the "progress of our mission" in Iraq and Afghanistan.

Ms. Thompson worked as a linguist for Lieutenant Colonel Dane A. Barksdale in 2008, and he had incredible things to say about his work with Ms. Thompson. *See* Exhibit N. LTC Barksdale described Ms. Thompson as an "outstanding professional that has an intuitive ability to relate to people," and explained that "her abilities have been critical to our mission success and diplomatic relations between local tribal and political leaders." *Id*. Ms. Thompson bridged cultural and religious understanding amongst both U.S. military personnel and local tribal leaders. "Her rapport with security and tribal leaders has mended and developed relationships that have prevented key fundamental issues boiling into sectarian violence." *Id*. Aside from being an "invaluable asset," LTC Barksdale further writes that Ms. Thompson "has a huge heart and is always trying to help people in need." He goes on, "Mary loves America and promotes the American image of a strong woman to these people." *Id*. But perhaps the most important thing he writes is that he "believes her role has had a direct impact in saving the lives of my Soldiers." *Id*.

It is clear that Ms. Thompson is a woman of integrity who made a terrible mistake after being manipulated. She is looked up to and loved by her family, friends, and colleagues. Ms. Thompson is deserving of this Court's leniency.

**C.  The Damage Ms. Thompson's Caused to the United States was Mitigated.**

On the spectrum of espionage cases, their seriousness in nature, and damage caused to the national security interests of the United States. Ms. Thompson's case must be examined in the context of this spectrum. Ms. Thompson wholeheartedly accepts responsibility for her actions. *See* Exhibit A. Understanding that the damage done by Ms. Thompson was extremely serious, her activities spanned a relatively short period of time of between early January 2020 through late February 2020, when she was arrested. Her activities were short-lived, and the United States Government was able to undertake measures to mitigate the damage done. Unlike others who have been prosecuted, Mariam Thompson was not a career spy who was attempting to sabotage U.S. foreign policy efforts for years. In fact, she held a clearance for some time, never acted in any compromising manner, and served the United States as a contract linguist for many years. Ms. Thompson was vulnerable, lonely, and completely taken advantage of by a master manipulator who led her to believe he loved her.

**D.  Ms. Thompson Poses Little or No Risk of Recidivism.**

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Ms. Thompson does not fit the archetype of a person who will commit new criminal offenses or recidivate. And because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar.  While

surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as not intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, *Booker* has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Ms. Thompson' character demonstrating her ability to reform, the Commission has also objectively quantified her low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. More specifically with respect to Ms. Thompson, who is 62 years old and a criminal history category of I have a recidivism rate of only 6.2 %. *Id.* at 28.

It is unfortunate that the Guidelines' offense levels do not take into consideration such data. The data exists yet is not utilized to inform the Commission's rulemaking. However, without even considering the circumstances of the offense, it is apparent that Ms. Thompson is not a person who is statistically likely to recidivate.

The Commission has also found that first offenders like Ms. Thompson are rarely reconvicted of a crime. In fact, only 3.5% of first offenders with zero criminal history points are ever reconvicted. *U.S Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May of 2004) (hereinafter *First Offender*). Only 11.7% of all first offenders ever find themselves back in the criminal justice system (defined as reconviction, re-arrest, or revocation). *First Offender* at Exhibit 6. This is Ms. Thompson's first conviction, and the experience taught her a valuable life lesson to ensure she does not repeat the mistakes of the past.

**E.  Ms. Thompson's Public Demise Serves as Adequate Deterrence to Others.**

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct."  Arguably, the government already substantially achieved the maximal deterrent effect of Ms. Thompson's offense simply by charging and convicting her.  As a result, Ms. Thompson's name and the substance of her offense will be discussed in numerous conversations and settings among family and friends and within certain professional environments for years to come, a shameful reality from which she simply cannot escape. In short, Ms. Thompson's public professional demise sends a strong message to anyone foolish enough to attempt to divulge classified information.

Accordingly, Ms. Thompson, by and through undersigned counsel, respectfully requests that the Court sentence her to a sentence of significantly below the low-end of the guidelines.

Respectfully submitted,

_____/s/_____
David Benowitz
DC Bar No. 451557
*Counsel for Mariam Thompson*
Price Benowitz LLP
409 7th Street, NW,
Suite 200
Washington, DC 20004
O: (202) 417-6000
M: (202) 271-5249
David@PriceBenowitz.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of June 2021, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via ECF to Assistant United States Attorney John Cummings and DOJ Attorney Jennifer Gellie, United States Attorney's Office, 555 Fourth Street, NW, Washington, DC 20530.

_____/s/_____
David Benowitz